**Billy W. JARVIS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 97–806T.**

United States Court of Federal Claims.

Sept. 27, 2000.

---

John D. Copeland, Dallas, Texas, for plaintiff.

Benjamin C. King, Jr., U.S. Department of Justice, Washington, D.C., with whom were Assistant Attorney General Loretta C. Argrett, Chief, Court of Federal Claims Section, Mildred L. Seidman, and Assistant Chief Thomas D. Sykes, U.S. Department of Justice, Washington, D.C., of counsel, for defendant.

## OPINION

BRUGGINK, Judge.

This case involves a claim for a reward under a tax-informant agreement entered into between the plaintiff, Billy Jarvis, and the Internal Revenue Service (IRS). Trial was held August 22–24, 2000, in Fort Worth, Texas. At the conclusion of trial the court issued a bench ruling denying the claim. For the reasons explained at that time and as elaborated here, we conclude that plaintiff breached his agreement with the IRS and is therefore not entitled to a reward.

## BACKGROUND

Plaintiff Billy Jarvis is a Certified Public Accountant (CPA) and a former employee of Montex Drilling Company (hereafter referred to as "Montex"), an oil and gas development company owned by W.A. "Tex" Moncrief, Jr. (hereafter referred to as "Tex"), and other members of the Moncrief family. Plaintiff was the controller for Montex from 1979 to June 1993.

Jarvis testified that during the early 1990's, while still employed at Montex, he became concerned that he would be associated with certain transactions, primarily accomplished in the latter half of the 1980's, that he thought would be viewed with a jaundiced eye by the IRS. Among other concerns, Jarvis felt that Tex had caused the Moncrief family's federal estate and gift taxes to be understated by amounts potentially in excess of $100,000,000.

A brief picture of the Moncrief family tree is useful. W.A. Moncrief, Sr. owned the family oil business. He died in 1986, leaving the bulk of his estate to his wife, who died in 1992. They had two sons, W.A., Jr. ("Tex"), and R.B., who pre-deceased them. Tex Moncrief had four sons, W.A. III, Richard, Charles, and Tom. R.B. had two sons, Michael and R.B. Jr. Jarvis testified that the transfers of property from the oldest to the succeeding generations were not handled with the strictest legal punctilio.

He was also concerned that, although an outside accountant firm, Bright and Bright, had prepared the tax returns, it would be apparent that he participated in their preparation and documentation. That fact, coupled with Tex's age, as well as the age of the head of the outside accounting firm, and coupled as well with a growing perception that his continuing employment with Montex was in question, left him in a precarious position to explain transactions to outsiders.

With these concerns in mind, in the fall of 1992 plaintiff asked his brother, Don Jarvis, then a practicing attorney, for advice. Don Jarvis advised his brother that, if plaintiff did not report his suspected violations of federal tax law, he himself could be violating the law and might be subject to criminal prosecution. Billy Jarvis was hesitant, however, to report his suspicions to law enforcement authorities. He was still employed by Montex and feared Tex Moncrief would retaliate against him.

Don Jarvis advised plaintiff that, before contacting the IRS, they should associate some other experts to assist them. Don therefore enlisted Jim Rolfe, the former United States Attorney for the Northern District of Texas, Sam Graber, an attorney from Sherman, Texas, with a background in tax law and estate planning, and Jim Keller, a CPA. Jarvis referred to this quartet as his "advisors." Someone in this group also suggested that Jarvis's civic-mindedness could be financially beneficial to him-he might be able to collect an award based on any additional tax collected from Tex or Montex. His

advisors therefore recommended that he work out a reward agreement with the IRS before turning over any information about Montex and Tex Moncrief to the government. They also recommended that they work out the agreement anonymously, without revealing Jarvis's identity, or the identity of the taxpayers, until a firm agreement was worked out with the IRS. Contemporaneously, Jarvis and his advisors agreed orally to a division among themselves of any reward. Don and Billy Jarvis were to get 35 percent each. The three other advisors would each receive ten percent.[1]

Because of concerns that the Dallas field office might not be a secure place to begin, Rolfe, Graber and Keller went to Washington in March 1993 to meet with the high ranking officials in the IRS. This led to a green light for the Dallas office to work out a written informer agreement. A number of IRS field agents, all from the Dallas Criminal Investigation office, subsequently became involved in the investigation. The lead agent was Donald Smith. He was assisted by, among others, agents Donald Wannick and Mike Sanders. All three testified for defendant. A meeting was held in Dallas on March 24, 1993 between some of Jarvis's advisors and IRS agents to negotiate the terms of a reward agreement. At this point the IRS agents still did not know Jarvis to be the informant or the identity of the target taxpayers.

The Jarvis representatives presented a draft agreement to the IRS at the March meeting. It was modeled heavily on a form agreement which Graber had obtained from the IRS. Graber's first draft omitted three paragraphs from the standard form. Included among the omissions were paragraphs 8(c) and 14 of the standard form. These dealt, respectively, with circumstances under which an award would be inappropriate, such

as if Jarvis had been involved in a tax avoidance scheme, and prohibitions on disclosure. The IRS refused to omit these provisions, and ultimately only minor plaintiff-initiated deviations from the standard form were allowed. Eventually agreement was reached on satisfactory language, and the reward agreement was signed on November 9, 1993. At that point Jarvis's identity, as well as that of the Moncriefs, was disclosed to the IRS.

By the time the agreement was signed, plaintiff had been fired by Tex Moncrief. Although he actually quit working in June 1993, he continued to draw salary until the middle of November 1993.

The reward agreement provided that Jarvis was to "provide information in a written form which may lead to the collection of a substantial amount in unpaid taxes from the persons and entities identified on Exhibit 'A' ... for the tax years set forth on said Exhibit 'A.' "[2] Five of the sixteen persons or entities named were hand-written onto Exhibit A by Jarvis at the time the agreement was signed. According to Samuel Graber, Michael Moncrief, Tex Moncrief's nephew and one of the late additions to Exhibit A, was not really a target of the subsequent investigation but was added merely because he was connected by various financial umbilici to Tex Moncrief. Jarvis testified, however, that he added the names because he believed that the result of adjusting the tax obligations of the Tex Moncrief-related targets might be the recovery of additional taxes from Michael Moncrief and three of the other persons added to Exhibit A. As he testified, "[W]e felt like that if the Internal Revenue Service decided to allocate taxes to them that we should share the taxes that they collected from them." Tr. p. 561. In short, he did not want to lose out on the possibility of a larger fee. The suggestion

---

1. A written agreement between the two Jarvis brothers, dated November 9, 1993, was put into the record. The other arrangements were apparently oral.

2. Exhibit A listed sixteen taxpayers and taxpayer identification numbers, and specified the relevant tax years as between 1985 and 1993. Among the taxpayers listed on Exhibit A are William A. Moncrief (deceased father of Tex

Moncrief), Elizabeth Bright Moncrief (deceased mother of Tex Moncrief), the respective estates of William and Elizabeth Moncrief, William A. "Tex" Moncrief, Jr., Charles B. Moncrief (Tex Moncrief's son), Richard W. Moncrief (Tex Moncrief's son), the W.A. Moncrief, Jr., Trust, Montex Drilling Company, the William A. and Elizabeth B. Moncrief Foundation, and Michael J. Moncrief (Tex Moncrief's nephew).

that Michael Moncrief was not a target, in other words, is completely at odds with both the wording of the informer agreement and with the facts.

Several provisions of the reward agreement are relevant here. Paragraph 7 sets out the potential recovery amounts and inserts a caveat:

> 7. The IRS will pay to the Informant amounts per the below-outlined schedule of the net taxes, fines and penalties (but not interest) collected from the Taxpayers as a direct result of information provided by the Informant that caused the investigation and resulted in the recovery:
>
> 10% of first $10,000,000.00
>
> 15% of next $10,000,000.00
>
> 20% of next $10,000,000.00
>
> 25% of amount over $30,000,000.00
>
> With a maximum reward not to exceed $25 million.

No payment shall be made if any of the conditions set forth in this agreement are not met.

Paragraphs 8, 14, and 18 impose further restrictions:

> 8. The Informant shall not be entitled to any payment under this agreement if:
>
> . . . .
>
> (c) Payment of a reward would be inappropriate, for example, when the informant participated substantially in the evasion scheme or prepared the return(s) for the Taxpayers with the knowledge that taxes were being evaded[.]
>
> 14. The informant shall not disclose any information regarding the Taxpayers, the alleged violations of Internal revenue [sic] laws, or the investigation, regardless of the source of the information, to any person other than the IRS officials identified in paragraph 11 [3] of this agreement, any person designated by those officials, or

the Informant's attorneys. In particular, the Informant shall not disclose any information protected under IRC § 6103 [4] except in accordance with the instructions of the Internal Revenue Service officials identified in paragraph 11.0.

> 18. . . . [t]his agreement may not be delegated or assigned directly or indirectly, in whole or in part, by operation of law or otherwise, by the informant.

When the reward agreement was executed, Jarvis turned over two boxes of documents containing thirty four documents that supported his allegations about possible tax fraud by Tex Moncrief.[5] Donald Smith executed a receipt, also on November 9. Jarvis retained copies of everything he gave the IRS.

As a result of Jarvis coming forward with this information, the IRS commenced an investigation of the Moncrief family and its business enterprises for possible criminal and civil violations of federal tax law. The IRS began debriefing Jarvis and gave him instructions regarding his conduct during the investigation. Jarvis was told that Donald R. Smith would be his "Controlling Agent," and he was to report any problems resulting from his cooperation with the IRS to Smith. A secret office was set up in McKinney, Texas, outside of Dallas, so that Jarvis could meet with some assurance of privacy with the agents. The temporary office closed at the end of January 1994. Jarvis's active participation in assisting with the investigation ended on March 30, 1995.

On May 19, 1994, the Tax Division of the Department of Justice (DOJ) launched a grand jury investigation of Tex Moncrief, other members of the Moncrief family, and various business interests controlled by the Moncriefs, including Montex. On August 29, 1994, based on information provided by Jarvis, the IRS obtained a search warrant for the Moncrief Building.[6] The IRS executed

---

**3.** Paragraph 11 of the Agreement specified that the IRS officials designated to receive information from Jarvis were the Dallas District Director and his designees.

**4.** 26 U.S.C. § 6103 (1994).

**5.** Jarvis testified that he had accumulated these documents at his residence as a convenience to himself and Montex, so that he could work on the company's tax matters at home.

**6.** The Moncrief Building was apparently the center from which Tex Moncrief conducted the family's various business enterprises.

the search warrant on September 1, 1994, and seized "several truckloads" of documents.

Before the seizure of documents, however, another series of related events had been unfolding. During the spring of 1994 Jarvis began to get more and more concerned about the amount of time it was taking for the IRS to execute a search warrant. He contacted Smith periodically, who assured Jarvis that things were progressing. The court finds that, because of these concerns, Jarvis began to develop an insurance policy in the event the IRS got cold feet.

Tex Moncrief had several common property and business interests with his nephew, Michael Moncrief.[7] As a result, during his employment by Tex Moncrief, Jarvis often had to communicate about these mutual interests with Michael Moncrief's chief accountant, Jerry Goodwin. Jarvis and Goodwin had also been personal friends for several years.

In March 1994, Jarvis told Goodwin that he suspected that Tex Moncrief had defrauded Michael Moncrief. Apparently Goodwin and Michael Moncrief had similar concerns of their own. Jerry Goodwin testified. He explained that he passed Jarvis's information to Michael Moncrief, who indicated that he wanted to speak with Jarvis. Eventually a series of meetings were held in the spring and summer of 1994 involving Michael Moncrief, Goodwin, Jarvis, and Jarvis's advisors. Jarvis and his representatives initially did not give out any specifics. They made it clear that he preferred not to divulge any information unless Michael Moncrief hired Gary Richardson, a Tulsa, Oklahoma attorney, to represent him against Tex Moncrief. Richardson is also licensed in Texas and was a former United States Attorney for the Eastern District of Oklahoma. Unbeknownst to Moncrief, Richardson had already agreed to split his potential legal fee with Rolfe, Jarvis and Jarvis's others advisors in the event he was hired by Michael Moncrief.

On July 23, 1994, after protracted negotiations regarding the contingency fee Richard-son would receive, Michael Moncrief agreed to retain Richardson to pursue the claims Jarvis had outlined. Although Jarvis denied that the principal purpose of the arrangement was to prepare for litigation with Tex Moncrief, the first stated purpose of the agreement was to engage Richardson's firm to "sue for and recover all damages and compensation to which Clients may be entitled." Moncrief and Goodwin did not know at this time that Jarvis was acting as an informer for the IRS.

The clients assigned to Richardson an undivided interest in the claims as security for payment of the forty percent contingent attorney fee. A separate provision was made for the "Williston Basis Lawsuit," a lawsuit previously commenced by Michael Moncrief and others in Wyoming. In the event that it became necessary for Richardson to participate in prosecuting that action, he would be paid on an hourly basis. Richardson was also authorized in the retainer agreement, out of his share of any contingent attorney fee, to associate Rolfe, Don Jarvis and Sam Graber as co-counsel. Michael Moncrief had to agree to any contracts with such co-counsel.

This arrangement was certainly unusual. Despite Jarvis's intimations that he was reluctantly being drawn into Michael Moncrief's claims against his uncle, the court finds that the opposite was true. Jarvis was instigating the litigation. As Goodwin wrote in his notes at the time, "In a normal situation, the client has been wronged (i.e., breach of contract, fiduciary duty, etc.) and he hires counsel who does not have the facts. In this case the attorneys have the facts and we don't." The court also finds that Jarvis's suggestion that he was doing his best to keep Michael Moncrief from suing his uncle so as not to upset IRS plans is a fictional reconstruction. His concern in this respect is belied by the fact that he had taken the initiative to promote the Michael Moncrief–Richardson contract in the spring of 1994, and undertook his litigation-consultant status with Michael Moncrief in July, 1994, both in

7. Michael Moncrief is an oil and gas investor and serves as Texas state senator. He testified at trial.

advance of the IRS execution of the subpoena on September 1, 1994—a subpoena he believed was necessary to preserve the documents the IRS needed in its investigation.

Billy Jarvis was not a party to the Moncrief–Richardson retainer agreement, except indirectly, in that he expected to share in Richardson's legal fee. On the same day that agreement was executed, however, Michael Moncrief, at the suggestion of Richardson, hired plaintiff as a "consultant" in pursuing the claims against Tex Moncrief. Jarvis was paid $5,000 per month, with the money being funneled through Richardson. This arrangement persisted for one year.

The retainer agreement allowed Michael Moncrief to terminate, if, after reviewing the material supplied by Jarvis, Moncrief did not feel the evidence was strong enough to justify commencing litigation. For that reason, Michael Moncrief instructed Goodwin to review Jarvis's evidence to evaluate the strength of the claims Jarvis had outlined. On July 24, 1994, Goodwin reviewed several boxes of evidence at plaintiff's home. Jarvis conceded that this was in substance the material he had given to the IRS "over a period of time." Tr. p. 593. Goodwin was presented four or five boxes of material, including income tax returns of W.A. Moncrief Sr., and Jr. (Tex Moncrief), as well as assorted family estate and gift tax returns. Goodwin testified that he spent an hour speaking with Jarvis, and then later went through the boxes of material. He spent sufficient time going through Moncrief tax returns and other documents that he could compile twenty pages of handwritten notes. Jarvis testified, however, that Goodwin only had the documents for "a few minutes." When confronted with Goodwin's testimony, he conceded that it might have been a few hours.[8]

Nor can there be any question that the information disclosed constituted "any information regarding the Taxpayers" within the meaning of paragraph 14, the disclosure prohibition of the reward agreement. The group of taxpayers targeted by the investigation included W.A. Moncrief Sr., and Eliza-beth Bright Moncrief, two individuals whose returns Goodwin examined.

One more agreement or putative agreement in the triumvirate now enters the picture. In substance, this arrangement would have split Richardson's contingent fee from any recovery representing Michael Moncrief against Tex Moncrief. This document, dated September 12, 1994, had six signatories: both Jarvises, Rolfe, Richardson, Keller, and Graber. It was entitled, "Contract and Agreement of Employment." The stated purpose of the contract was to set forth "those agreements reached among the group known as 'the Attorneys' regarding attorney fees to be shared in and between said attorneys."

There are a number of peculiarities about this agreement, not the least of which is that it purported to have an attorney (Richardson) splitting legal fees with non-attorneys (Billy Jarvis and Keller), a violation of ethical canons for lawyers in Texas.[9] The agreement also is obviously incomplete. In paragraph 1 Richardson indicates that he will receive only one third of his fee in the Moncrief matter. There is no indication who will receive the remaining two thirds, although it is clear from Billy Jarvis's and Keller's testimony that he and his advisors were expecting to receive the balance. Finally, in paragraph two Richardson is promised one tenth of the award recovered in "the IRS litigation." Although Billy Jarvis testified that there was no "IRS litigation" to which a reward could attach, the court finds this purported ignorance to be feigned. Neither he nor anyone else offered an alternative explanation to the logical one-that it refers to the criminal investigation of Tex Moncrief. Richardson was to receive his share from portions of the shares of Billy Jarvis and his advisors. Neither Michael Moncrief nor Goodwin knew of the existence of this agreement.

Defendant contends that the agreement is a violation of paragraph 18 of the reward agreement, which provides that the agree-

---

8. Q. "For a few minutes? He was there for, what, three hours, wasn't he?" A. "Well, that's a few minutes to me...." Tr. p. 679.

9. *See* Texas Disciplinary Rules of Professional Conduct R. 5.04.

ment may not be "delegated or assigned directly or indirectly, in whole or in part . . ." Jarvis urges the court to ignore the document, however, on the basis that it is void and unenforceable. In that connection, Jarvis and his advisors all testified that they understood at the time they signed the document that it had serious problems. Jim Rolfe testified that he knew at the time that "there was an ethical prohibition against a lawyer splitting a legal fee with a nonlawyer." Tr. p. 466. Sam Graber testified that he "recognized that it had many problems, and I was assured by Don Jarvis that the contract would be corrected by Jim Rolfe . . . ." Tr. p. 483.

They were nevertheless in a hurry to sign it. Rolfe testified that Richardson, without explanation, urged him and the others to sign it. Don Jarvis said that he signed it because Rolfe urged him to sign it. The others testified that they signed it because Don Jarvis urged them to sign it, on the urging of Rolfe.[10] None of the quartet asked for any further explanation for the urgency, despite what they now suggest were their serious misgivings. This post-facto effort to dissociate from what became a radioactive document is unpersuasive. The court finds that the real reason the parties were in a hurry to sign a document they now say was meaningless is that Don Jarvis was appointed a state court trial judge before the end of September, 1994. Thereafter he would not be practicing law and thus not be able to enter into any new fee-splitting arrangements.

Approximately a year after the agreement was signed, Gerald Hilsher, an associate in Richardson's firm and the lead person working on the Moncrief case, found out about the fee-splitting arrangement when he ran across an unexecuted[11] copy of the agreement. He confronted Jarvis and Graber about it, who assured him it was not signed. When he discovered a signed copy of the agreement, he confronted Richardson, who told him it was of no consequence as it was unenforceable. Shortly thereafter, Jarvis sent Richardson a letter, at Richardson's request, disavowing the arrangement.

Meanwhile, with respect to his representation of Michael Moncrief, Richardson sent a letter to Tex Moncrief on September 12, 1994, demanding an accounting of the matters outlined in the retainer agreement. Apparently not satisfied with the response, he filed suit on behalf of Michael Moncrief and others against Tex, Charles, and Richard W. Moncrief on March 7, 1995.

Jarvis kept his activities on behalf of Richardson and Michael Moncrief a secret from the IRS. His testimony that Don Smith knew that he was meeting with Michael Moncrief and that Smith should have known about his participation in possible civil litigation against Tex Moncrief is simply implausible. The court believes Smith that he knew nothing of Jarvis's side activities with Michael Moncrief until August 1995. Jarvis certainly never told anyone at the IRS that he had a "consulting agreement" with Moncrief, that he had disclosed substantial amounts of information to Moncrief, or that he had signed an agreement to split his reward with Richardson. Nor, for that matter, did Michael Moncrief and Goodwin know that Jarvis was cooperating with the IRS in its investigation of the Moncrief family and that Jarvis stood to earn a reward based on the possibility of Michael Moncrief paying more in taxes.

Richardson plainly did know, however. Jarvis denied having told Richardson he was an informer, which is implausible on its face. But even if Jarvis did not tell Richardson himself, he plainly endorsed his representatives telling Richardson about his informer status because it is explicit in the fee-splitting agreement. At a later date, Jarvis disclosed his involvement with the IRS to Moncrief's representatives. In notes dated January 19, 1995, Goodwin reflects that in a meeting between Godwin, Jarvis and Lyndell Kirkley, Michael Moncrief's regular attorney, Jarvis stated that "I've been reviewing that issue [the Powell Pressure Maintenance Unit] because the IRS is interested in that."

10. Graber testified "that this was the biggest case I'd ever been involved in." Tr. p. 483.

11. Only Richardson had signed the copy he discovered.

Throughout 1994 until spring of 1995, plaintiff continued both to work for the IRS in reviewing and interpreting documents seized at the Moncrief building and to be paid as a consultant by Richardson. In the spring of 1995, Assistant United States Attorney Richard Roper, who was the lead prosecuting attorney in the Moncrief investigation, was told by an attorney for Tex Moncrief that plaintiff had been meeting with Jerry Goodwin and that information was being exchanged. Roper called Rolfe and asked him about these contacts. Rolfe assured him that these were harmless social meetings-a continuation of a long-standing practice of eating lunch together. This was confirmed by IRS agents.

On April 5, 1995, Roper summoned Jarvis's advisors to a meeting at the United States Attorney's offices in Fort Worth, Texas. Jarvis was not allowed to sit in. The meeting was attended by Roper, IRS Special Agents Donald Smith, Paul Shanks and Mike Sanders, as well as Rolfe, Don Jarvis, Graber, and Keller. Roper called the meeting because of his concern, after reviewing all the material seized from the Moncrief raid, that Jarvis himself participated in the alleged tax evasion scheme.

The April 5 meeting, and subsequent communications between plaintiff and the IRS or DOJ, are the basis for an assertion by plaintiff that paragraph 8(c) of the reward agreement-which disqualifies an informer for "inappropriate" conduct, such as participating in the tax evasion scheme-would be waived. The parties agree that, as a result of the meeting, plaintiff was told temporarily to terminate his activities in connection with the investigation, pending DOJ satisfying itself that he was not a co-conspirator. There was discussion about an immunity agreement and possibly modifying the contract. Beyond that, the parties offer different versions, both of what happened at the meeting and of what happened subsequently. Jarvis contends that his representatives were told that, if plaintiff were permitted to return, it would only be on the basis that he would not be prosecuted and that his reward would not be endangered. Defendant contends that no as-

surances of any kind were given at the meeting.

Plaintiff's version was presented through the testimony of Rolfe, Graber, Keller and Don Jarvis. Don Jarvis testified that Rolfe announced that, for plaintiff to continue to work, paragraph 8(c) would have to be deleted, and that he left the meeting with the impression that, whatever problems there were with the contract, they would be waived by the IRS if Billy Jarvis returned. Don Jarvis's impression was that Roper and Rolfe "would talk about deleting that entire paragraph." Tr. p. 347. He further testified that "we left that meeting, thinking that if Bill were to be called back to the investigation, then if there had been any problems under the contract, that they would be waived." Tr. p. 349.

Roper, on the other hand, testified that "there was a substantial discussion about the matter, and we concluded at the end of the meeting, we weren't going to do it. I think I said at the meeting, We're going to have to talk about it some more, too, and we'd get back with them. Eventually I got back with them and told him that we weren't going to ever take out that provision in the agreement, as far as I was concerned." Tr. p. 187. It is undisputed that the agreement was never formally modified.

At a meeting on June 25, 1995, Roper and others concluded that DOJ could continue to work with Jarvis. This information was relayed to Rolfe, who told Jarvis he was back on the case. Contrary to what Rolfe testified were his expectations or demands, DOJ and the IRS did not agree to eliminate or amend paragraph 8(c). Nor did the government make any promises that a reward would be forthcoming. It decided that the question of a reward would be deferred until after the investigation concluded. The perception of Jarvis's advisors that it was agreed that "an award would be forthcoming" is an overstatement of what Roper and other government representatives stated at or after the meeting. Even if that were not the case, the court finds that the general assurances plaintiff relies upon did not constitute an agreement to pay an award irrespective of Jarvis's violation of the agreement-a circumstance of

which the government's representatives were, in any event, ignorant at the time. In short, the court finds that there was no oral or written agreement either that paragraph 8(c) would be waived, or that plaintiff would be paid an award, irrespective of what he had done.

Nor did Roper agree to give Jarvis general immunity from prosecution. Instead, Roper issued a "410" letter on May 11, 1995, the effect of which was to grant a limited immunity from prosecution based on truthful information Jarvis had provided.

The parties agree that one agreement definitely flowed from the April meeting, namely, that Jarvis would discontinue all contacts with Michael Moncrief's representatives. A follow-up memorandum prepared by Special Agent Shanks detailing the events of the April 5 meeting states that Roper expressed to Jarvis's advisors that he "felt the [plaintiff] could jeopardize the government's investigation if he kept talking to Mike Moncrief and/or his controller." The memorandum goes on to state that, "Rolfe thought [plaintiff's] discussions with Mike Moncrief were unrelated to the case. However, Rolfe stated that he would take care of it." In an affidavit executed in this action on April 14, 2000, Jarvis wrote that "Roper said that if I continued to meet with Mike Moncrief or his controller, it could jeopardize the investigation.... Rolfe told me to discontinue my meetings with Goodwin or any of Mike's people, and I did so immediately. That issue was resolved on the spot." This statement is a fabrication. Jarvis admitted during cross examination that he continued to meet with Gerald Hilsher and with Mark Rambin of the Peterson Consulting Firm.

In July, 1995 Jarvis was subpoenaed to appear at a deposition in the Moncrief versus Moncrief litigation. His attorney, Rolfe, succeeded in postponing the deposition for a brief time, but eventually Jarvis appeared, and, on Rolfe's advice, declined to answer any questions, claiming his right against self incrimination. Eventually Jarvis was directed to testify, and he did so.

On January 2, 1996, Roper recommended that the grand jury investigation of the Moncriefs be concluded without filing any criminal charges. Shortly thereafter, the IRS and the Moncriefs entered into a civil settlement of all tax claims against the following taxpayers: Montex, Tex and Charles Moncrief, eight other members of the Moncrief family, and the respective estates of William A. Moncrief, Sr., and Elizabeth B. Moncrief. As settlement for all tax liabilities for tax years ending before August 31, 1994, the taxpayers agreed to pay the government a total of $23,070,992.00, plus $108,000 to cover the cost of the IRS investigation.

Jarvis later submitted a formal claim for an award. In a telephone conversation in November, 1996 with IRS Informant Claims Coordinator Steve Riegler, Jarvis was told his reward was being processed and that $1.73 million had been allocated to pay plaintiff's reward. A check was expected shortly. On November 26, 1996, IRS Assistant Regional Counsel, Gary A. Anderson, wrote Jarvis' attorney.[12] His letter stated that the "IRS is of the opinion that your client committed material breaches of the informant agreement, including the nondisclosure clause, prior to the civil settlement with the Moncrief family. The amount of reward, if any, due to your client is currently being evaluated."

Despite Jarvis' continued demands, no reward was ever paid. This suit commenced in November 1997. By order of March 31, 1999, the court granted defendant's motion for partial summary judgment, thereby denying Jarvis's claim that his reward should be calculated on the basis of what the IRS

12. Plaintiff, Don Jarvis, James Rolfe, Gary Richardson, Gary L. Richardson & Associates (Richardson's law firm), and Gerald Hilsher (a former associate attorney at Richardson & Associates) had all been sued by Tex, Charles, and Richard W. Moncrief (son of Tex Moncrief) as third-party defendants in the litigation Michael Moncrief commenced on March 7, 1995. Plaintiff was alleged to have breached his fiduciary duty in the course of his employment by the Moncrief family, to have stolen and intentionally disclosed confidential documents, and to have intentionally misrepresented facts about the Moncrief family to the IRS, Michael Moncrief, and plaintiff's advisors. The complaint also listed causes of action for conspiracy and intentional infliction of emotional distress.

should, in his view, have collected from Tex Moncrief and Montex. We held that plaintiff's maximum recovery was limited to $1,769,099.18.[13] Jarvis's April 2000 motion for summary judgment was denied on the grounds that there were material issues of fact with respect to the government's defenses.

### DISCUSSION

Defendant has conceded that the information that plaintiff provided to the government pursuant to the reward agreement resulted in the collection of taxes from the Moncriefs. The sole issue remaining for trial was whether Jarvis had breached the informant agreement, thereby making himself ineligible for a reward.

Defendant maintains that plaintiff breached paragraphs 8, 14, and 18 of his agreement with the IRS. Paragraph 8 has a preamble: "The Informant shall not be entitled to any payment under this agreement if ...." It then goes on to list specific disqualifying circumstances, including subparagraph (c), which states that no reward is due if "[p]ayment ... would be inappropriate." An example is provided-participation in the tax evasion scheme being investigated. Defendant relies on this language to bring in violations of other provisions of the contract, specifically, paragraphs 14 and 18, which deal with disclosure of information and delegation of the reward.

Jarvis has two initial arguments. The first is that paragraph 8(c) is limited by its terms to the example illustrated, i.e., participation in the tax evasion scheme. The government did not make that argument at trial, hence paragraph 8 is not violated. The second argument is that paragraphs 14 and 18 are not among the grounds for forfeiting a reward listed in paragraph 8 and hence cannot form the basis of a breach claim.

The court disagrees. First, paragraph 8(c) is not limited to the example cited there. The phrase, "for example," means that there can be other varieties of inappropriate conduct. The court holds that material breaches of the agreement, irrespective of whether they are listed in paragraph 8, can amount to inappropriate, and therefore, disqualifying, behavior. Second, the last sentence of paragraph 7 of the agreement states that "[n]o payment shall be made if any of the conditions set forth in this agreement are not met." Paragraphs 14 and 18 thus can form independent grounds for denying a reward.

Jarvis plainly violated paragraph 14 by disclosing "information regarding the [t]axpayers, the alleged violations of Internal Revenue laws, or the investigation, regardless of the source of the information to any person other than the IRS officials ...." There is no question that he disclosed information to Jerry Goodwin and Michael Moncrief.[14] Indeed, he concedes that "the same documents would have been needed to prove up the IRS case as he might need to prove up his [Michael Moncrief's] case." Tr. p. 673. There is also no question that Jarvis's comment to Goodwin that "the IRS is interested in that," violated paragraph 14 by informing Goodwin that an investigation was underway.

Although James Rolfe testified that he informed Jarvis that his disclosure of information to Goodwin and Michael Moncrief was not a violation of the agreement because Jarvis did not get the information from the IRS, the court reads [15] the agreement differently. It explicitly precludes disclosure "regardless of the source of the information."

Jarvis violated paragraph 18 by agreeing to split his reward with Gary Richardson.

---

**13.** *See Jarvis v. United States,* 43 Fed.Cl. 529, *recons. denied,* 45 Fed.Cl. 19 (1999).

**14.** Plaintiff made the remarkable assertion during cross examination that only the IRS had possession of tax information, as a taxpayer only retains file copies:

A. "...if you get real technical about it, these weren't real tax returns because they had not been filed, Mr. King."

Q. "These were the taxpayers copies of the tax—these were the Moncrief's file copies of their tax returns?"
A. "That's correct."
Tr. p. 676. If this bit of sophistry were accepted, Jarvis could only have violated the agreement by first obtaining original filed copies of tax returns from the IRS.

**15.** Rolfe testified that he only did a cursory reading of the contract.

Irrespective of whether Jarvis violated the agreement by splitting his reward with his "advisors," [16] with whom the government was acquainted, Richardson was not acting as Jarvis's attorney. Their only connection was that they agreed to split Jarvis' reward in exchange for splitting Richardson's attorney fee. The court holds that this constitutes a prohibited direct or indirect delegation or assignment of his reward.

Finally, the court concludes that the arrangement Jarvis entered into with Michael Moncrief independently makes payment of an award inappropriate under paragraph 8(c). Paul Coggins, United States Attorney for the Northern District of Texas at the time, testified that his discovery that Jarvis had secretly arranged to assist in promoting the related civil litigation tainted him as a witness. As he explained, "[W]e have a situation where not only ... did the informant have a financial interest in the outcome of the case,... but here we had an informant who was at the time misleading the Government...."

Roper endorsed this view: "I don't think I could ever in good faith put him on a witness stand.... [T]here wouldn't be a jury in Texas that would believe him." The very reason, in other words, that the investigation was terminated was that Jarvis—the key witness—was compromised. Even James Rolfe, plaintiff's witness, gave the following candid assessment of the effect of the subpoena on the criminal investigation: "Everything deteriorated after—the Government's case totally deteriorated after that." Tr. p. 445–46. Under the circumstances, the court holds that plaintiff forfeited any right to a recovery.

## CONCLUSION

Jarvis might have earned a substantial reward if he had not decided to play the risky game of deceiving the IRS and Michael Moncrief, in addition to Tex Moncrief. In making that decision he erred in relying on the judgment of advisors whose interests in giving objective counsel may have been compromised by the prospect of sharing in his gains. Despite the fact that his information assisted

the investigation into Tex Moncrief, plaintiff forfeited any right to a reward by breaching the agreement. Accordingly, the Clerk is directed to dismiss the complaint. Costs to the defendant.

---

16. Samuel Graber testified that he inquired of the U.S. Attorney's office in Dallas whether reward splitting with an attorney was permitted. He was informed that it was.